[Civ. No. 17289.   First Dist., Div. One.   May 10, 1957.]

LILLIAN STANTON et al., Respondents, v. WELLS FARGO BANK AND UNION TRUST COMPANY, Appellant.

Heller, Ehrman, White & McAuliffe and Lawrence C. Baker for Appellant.

Eugene H. O'Donnell, in pro. per., Philip S. Ehrlich, Albert A. Axelrod, Irving Rovens and Bronson, Bronson & McKinnon for Respondents.

PETERS, P. J.—A testamentary trust expressly limited the trustees in investing and reinvesting the trust property to the purchase of certain types of bonds. This action was brought to secure a modification of this provision so as to permit the trustees to invest and reinvest in those securities permitted by section 2261 of the Civil Code.

The action was initiated by three of the four life beneficiaries of a trust created by the will of Sanford Sachs, who died in 1931. The estate was distributed in July of 1936. Under the terms of the decree of final distribution, the residue of the estate was distributed to the Wells Fargo Bank and Union Trust Company, and to Hilda Newbauer, a niece of

the deceased, as trustees. The trustees were directed to pay to Hilda Newbauer, for life, the income from one-half of the corpus. The other one-half of the income was to go to Hilda Newbauer's three children, Lillian Stanton, Helene Preis and J. Newbauer, for their respective lives. These three children initiated this action.

The trust provides that upon Hilda Newbauer's death her share of the estate will vest in her testamentary appointees, and, failing appointment, in her issue. The other three income beneficiaries are also given the power of appointment, and, failing appointment, the share of such income beneficiary vests in his or her issue, and, failing issue, in the survivor or survivors of the three. J. Newbauer, one of the petitioners, died prior to trial without exercising his power of appointment and without issue. His share of the estate was thus vested in his two sisters, Lillian Stanton and Helene Preis. Hilda Newbauer has been declared incompetent and Helene Preis has been appointed cotrustee with the bank. By the same order substituting her as trustee Helene Preis was eliminated from this proceeding as a petitioner. Thus, by the time of trial Lillian Stanton was the sole petitioner in this proceeding.

A guardian *ad litem* was appointed to represent Hilda Newbauer, and that guardian appeared in the proceedings and requested that the prayer of the petition be granted. Helene Preis and her children, as well as those of Lillian Stanton, also appeared and also requested that the petition be granted. Thus, all persons in being, that is, all life beneficiaries and their children and one of the two trustees, appeared in the proceeding requesting that the petition be granted. The Wells Fargo Bank, one of the two trustees, objected to the granting of the petition. The only persons not represented in the proceeding are the possible unborn issue of Lillian Stanton and Helene Preis. Both of these life beneficiaries were over 40 years of age when this proceeding was instituted in December of 1951.

The trial court entered its judgment in favor of the petitioner ordering that the trust provisions relating to investments in bonds be amended to permit reinvestment as provided in section 2261 of the Civil Code. Wells Fargo has appealed. In *Stanton* v. *Preis*, 138 Cal.App.2d 104 [291 P.2d 118], this court denied a motion to dismiss this appeal, holding that one of two cotrustees may appeal from such a

judgment without the cooperation or even against the will of the other trustee.

The trust involved was executed in December of 1930. The decree of distribution was entered in April of 1936. In accordance with the terms of the will the decree provided that the trustees "shall have full power and authority . . . to invest and reinvest any of the trust property . . . as to the trustee shall deem fit and proper," subject to the limitation "that investments by the trustees shall be made only in bonds of the United States Government, in bonds of the States of the United States, and municipalities thereof, and in such other bonds (the bonds of foreign governments or foreign municipalities excluded) as shall be rated at least 'AA' by Moody Investor's Service, or in the event such service shall no longer be in existence, by such first class service as such trustees shall deem best."

The petition herein alleges that there has been a change in economic conditions not anticipated by the settlor since the trust was executed, and that, should the restrictive investment provision be followed, such changed circumstances may substantially impair the purpose of the trust. It is alleged that it was the intent of the settlor to assure the beneficiaries a continued income from the corpus in as large an amount as is consistent with reasonable investment safety; that such restrictive provision was inserted because the trust was executed in the middle of a financial depression when investments in stocks and real estate were in general disrepute; that the settlor was not innately opposed to investments in stocks; that since the death of the settlor the investment situation has been subjected to a "radical change"; that now there is confidence in investments in stocks because of the gradual rise in their market values and in their dividend rate; that such investments are now recognized as suitable and desirable for trusts; that the California Legislature has recognized this by the adoption of the "Prudent Man Rule" of investments embodied in section 2261 of the Civil Code; that the petitioner believes that some of the securities and real estate in the trust should now be sold so as to avoid loss, but, if this is done, the proceeds from such sales would have to be invested in the specified types of bonds; that under present conditions such investment in bonds would not be desirable because of their low yield and because they would not constitute a hedge against inflation; that as a result, if the restrictive investment provisions remain, the income of the life

beneficiaries will be materially decreased and the interest of the remainderman depreciated; that the investment restrictions are so disadvantageous to all the beneficiaries "as to endanger the essential trust purposes," and that the settlor, if he had anticipated the present economic conditions, would have inserted the more flexible investment provisions.

At the trial, in May of 1955, petitioner introduced Exhibit 4 to show the nature of the investments at the date of death of the settlor, the date of distribution, and on December 31, 1954. The exhibit also gives some idea of the general change in the economy between those dates. It can be summarized as follows:

| Composition | Date of Death 5-7-31 | Date of Distribution 7-16-36 | December 31, 1954 |
|---|---|---|---|
| Bonds ............ | 4.2% | .3% | 17.4% |
| Preferred Stocks .. | 6.8% | 3.8% | 2.0% |
| Common Stocks .... | 49.9% | 47.2% | 50.0% |
| Real Estate ....... | 35.0% | 48.2% | 29.9% |
| Others ............ | 4.1% | .5% | .7% |
| | 100.0% | 100.0% | 100.0% |
| Total Dollar Values ....| $3,460,516.04 | $2,323,718.50 | $2,860,687.21 |
| Dow Jones Averages | | | |
| Bonds ............ | 95.57 | 103.37 | 101.00 |
| Industrials ........ | 148.88 | 163.64 | 404.39 |
| *Consumer Price Index .......... | 65.4 | 59.4 | 114.3 |
| *Wholesale Price Index .......... | 47.6 | 52.3 | 109.5 |

*Basis: 1947-1949 = 100

Other exhibits show that two pieces of San Francisco realty increased in appraised value $60,000 between 1931 and 1954, and that an Oakland property decreased in value $225,000 between the same dates.

Five witnesses testified at the trial. Four of these were officers of the appellant bank, and the fifth, called by respondent, was an associate professor of business administration and research at the University of California. The bankers testified that the usual practice in trust administration is to buy and sell securities as conditions warrant; that if the trustee has the power only to invest in bonds, assuming a general inflationary trend, the risk to the corpus of the trust is increased, because of the reduced purchasing power of the fixed bond principal; that, when possible, it is the

policy of the bank to keep about 50 per cent of the corpus invested in common stocks; that in the trust before the court the trustees are required, except as to the exercise of subscription rights, to keep all the common stocks presently in the trust in order that the 50 per cent ratio be maintained; that in their opinion the so-called "Prudent Man Rule" applicable to trust investments is a helpful provision; that it is the policy of the bank as trustee to try to achieve for trust beneficiaries the highest income consistent with the preservation of the principal; and that the bank invests and reinvests with the view of trying to secure added income as well as increased principal. The officer in charge of trust investments and the security analysis department of the bank testified that he would not advise a person contemplating creating a trust to place a bond restriction on investments in the trust because he believed that it was desirable to have flexibility in such matters. It is a reasonable inference from the testimony of one of the bankers that he would advise the sale of the Oakland real property were it not that the money so secured would have to be reinvested in bonds.

The professor gave an informative and lengthy discourse on the general changes in the economy between 1930 and 1954, pointing out the general inflationary trend since the depression years. He admitted, however, that the indices had leveled off somewhat since early 1954.

The trial court made findings generally in accord with the allegations of the petition. Respondent points particularly to findings to the effect that it was the intent of the settlor to secure an income for the life beneficiaries in as large amount as possible commensurate with reasonable safety; that the sole purpose of the restrictions was to protect the corpus; that because of changes in the general economy this purpose is "being defeated and thwarted; . . . [a] result the testator could not have foreseen prior to his death." It was also found that the settlor was influenced by investment conditions existing at the time he planned the trust, but "was not adverse to investing in common and/or preferred stocks, or real estate, which fact is evident by the large number of preferred and common stocks and the real estate which constituted a part of the residue of the decedent's estate distributed to the trustees, the defendants herein, under the decree of final distribution."[*]

---

[*]The important date that the court should have mentioned here is 1931, the date of death of the testator, and not 1936, the date of the

The sole question presented is whether, under this state of facts, the trial court was justified in exercising its admitted equitable powers by authorizing deviation from the trust terms relating to investments.

Appellant concedes, of course, that since 1931 economic conditions have changed, but argues that such change alone does not warrant a court in authorizing the trustees to deviate from the terms of the trust. It is argued that to warrant deviation some emergency endangering the main trust purpose must exist, and it is contended that there is no evidence of such an emergency. Appellant considers it significant that since the inception of the trust the estate has been substantially invested in common stocks and realty, with bonds, as late as December 31, 1954, comprising only 17.4 per cent of the estate. Appellant argues that respondent seeks the deviation solely because the bond investment provision is inflexible, and believes that flexibility would be preferable, and contends such fact alone did not warrant the court in authorizing the deviation. Appellant points out (p. 19 of its opening brief):

". . . this lack of flexibility was inherent at the time of the creation of the trust. While flexibility may be desirable and while trustors might be better advised to provide for it, its lack does not create the emergency situation which is necessary to move the court to order deviation. . . .

"In short, there has been no showing of an emergency or exigency which menaces the trust estate and the beneficiaries, no showing of extreme hardship, of virtual necessity, of serious or any impairment of principal, or of inability to carry out the purpose of the trust which, . . . must appear in order to authorize a deviation."

The main contention of respondent in answer to these arguments is that if the trustees are compelled to adhere to the terms of the trust the settlor's intent and his main trust purpose would be frustrated. It is argued that all of the interested beneficiaries, including the living remaindermen, have consented to the deviation, and all will benefit by the proposed modification. Respondent refers specifically to the evi-

---

final distribution. This is so because until distribution the executors were not bound by the bond restriction as to investments, and there is evidence that during probate and prior to distribution the executors purchased stock with the restrictive investment provision that would apply to the trustees in mind. However, this oversight in the findings is not important because the figures for the proper date are in the record.

dence showing a marked decline in the purchasing power of the dollar, and to the return on bonds as compared to the return on stocks. It is urged that since the settlor drafted this trust the following unanticipated events have occurred: The depression of the thirties; World War II and the cold war; the current defense program; the increase in income taxes; and the government controls on capital. In order to keep the record straight, it is obvious that respondent erroneously refers to the depression as an unanticipated event. The trust was drafted in the middle of the depression and undoubtedly the depression was one of the reasons that motivated the trustor to insert the provision in question.

The problem of when a court may permit a deviation from the provisions of a trust has been discussed by many commentators and text writers. (See 23 Cal.L.Rev. 86; 34 Cal.L. Rev. 453; 28 Cal.L.Rev. 785; 21 So.Cal.L.Rev. 433; 170 A.L.R. 1219; 168 A.L.R. 1018; 4 Pomeroy's Equity Jurisprudence, §§ 1062, 1062b, 1073a; 2 Scott on Trusts, § 167, p. 836; 3 Bogert on Trusts and Trustees, §§ 561, 562; Rest., Trusts, § 167.)

The power to permit deviation from the terms of private trusts is analogous to the *cy-pres* doctrine applicable to charitable trusts. (*Estate of Loring*, 29 Cal.2d 423 [175 P.2d 524].) A few generalizations can be made. ■ Normally, of course, the trust instrument constitutes the measure of the trustee's powers. (*Bryson* v. *Bryson*, 62 Cal.App. 170 [216 P. 391].) Except in unusual or emergency situations the courts will limit the trustees to the powers conferred. ■ But the courts will not permit the main purpose of a trust to fail by compelling slavish adherence to the administrative limitations of the trust instrument. Where the main purpose of the trust is threatened the courts will and should grant permission to deviate from restrictive administrative provisions. But the court should not permit a deviation simply because the beneficiaries request it where the main purpose of the trust is not threatened and no emergency exists or is threatened. It must be remembered that it is the theory of this rule that, by the exercise of this power, the court is not defeating the trust, but in fact is furthering it. The equity court is simply doing what the testator, presumably, would have done had he anticipated the changed conditions. In other words, the specific intent of the testator is disregarded in order to enforce his general intent.

■ In the instant case all persons interested in the trust

except one trustee, and unlikely unborn contingent remainder-men, request that the modification be made. This is a factor to be considered. Also, the requested modification concerns only the method of administration of the trust and does not affect any rights of the beneficiaries between themselves. This, too, is important. It should also be mentioned that the object-ing trustee concedes that the existing restriction is ill-advised. No doubt economic changes have occurred since 1931.

On the other hand, the considered conclusions of the settlor regarding what should constitute appropriate investments cannot be lightly disregarded. He had managed to preserve a large fortune during a terrible depression. He had seen stock investments wiped out overnight. He knew that in the past there had been recurring periods of inflation and defla-tion. He, the man who had accumulated this fortune, whose property it was, wanted to protect his niece and her children from such vicissitudes, and to provide them with an adequate income. He decided that this could best be done by limiting the trustee's reinvestment powers to the purchase of certain types of bonds. While the equity court has the power in an emergency to disregard these directions, the express and con-sidered wishes and desires of the settlor should not be cava-lierly disregarded. In the instant case the judgment of the settlor, to date, has not proved devastatingly erroneous. The trustees received assets in 1936 of the value of $2,323,718.50. By December 31, 1954, these assets were worth $2,860,687.21. The distributable annual income was $88,890.60 in 1938, and by 1954 this had increased to $109,942.84. There is no evi-dence that any beneficiary is in want or that the distributable income is not sufficient to supply the reasonable needs of all beneficiaries. No emergency exists. The existing inflationary cycle has continued for some years. The government has adopted many economic measures to try to control and stop this inflationary trend. Some economists predict an era of deflation and others warn us of a depression. These matters are mentioned to indicate that, while the settlor may not have been omniscient, neither are the beneficiaries nor the courts, omniscient. No one can forecast, with any certainty, future events. Certainly, it is true that misguided re-strictions imposed by a settlor should not be permitted to defeat his fundamental trust purpose, but it is equally true that the court should not try to guess what economic condi-tions may be in a few years by permitting deviations when no real emergency exists or is threatened.

These general conclusions are supported by the decided cases both in California and other states. One of the leading California cases is *Adams* v. *Cook*, 15 Cal.2d 352 [101 P.2d 484]. A business trust there conveyed certain real property to trustees with instructions to sell such property at a named price, or at a lesser price if the trustees considered this in the best interest of the beneficiaries. The trustees were given power to lease the property but only "subject to the sale of said property under the conditions of this trust." (P. 354.) Oil was found on nearby property and application by drillers was made for an oil lease of the premises. They would not accept a lease subject to the trust conditions of sale, and the trustee refused to execute a lease under any other circumstances. Ninety per cent of the beneficial interests sought declaratory relief, requesting permission to lease the property for drilling; one of the beneficiaries objected. The court affirmed a judgment authorizing the trustee to enter into oil leases without inserting the trust condition of sale. This was based on findings that the intent of the trustors was to secure the largest return possible on the investment; that they did not at the time of the creation of the trust know the property contained oil; that the highest purpose for which the property. was adapted was the production of oil and gas; and that the drilling of other wells on contiguous properties would seriously deplete the corpus.

It was stated as well settled that "a court of equity has the power to change the method of administering a trust estate, when it is shown that such a change is necessary to prevent loss or destruction of the trust property. . . ." (P. 358.)

At page 360 the court made the following comments: "It seems only reasonable to assume that had the trustors, at the time the trust was created, any knowledge that oil and gas could be produced from the trust property, they would have had the declaration of trust provide for a lease thereof for that purpose. In giving to the trustee this right to lease the trust property for the production of oil and gas, the court is only doing what the trustors would have done had they had the same facts before them then that were before this court at the trial of this action."

At page 361 the applicable rules were summarized as follows: "It is perfectly clear from the above authorities that the rule against courts modifying the terms of a contract, and that they should construe it precisely as the parties had made it, does not apply to declarations of trust, where the primary purpose of the trust would not be accomplished by a strict

adherence to the terms of the declaration of trust and that when it is made to appear in a court of equity, as was shown in the present case, that the benefits and advantages which the trustors desired to confer upon the beneficiaries would not accrue to them by 'a slavish adherence to the terms of the trust,' the court may modify the terms of the trust to accomplish the real intent and purpose of the trustors.''

In *Leonardini* v. *Wells Fargo Bank*, 131 Cal.App.2d 9 [280 P.2d 81, 49 A.L.R.2d 1085], this court affirmed a trial court's refusal to modify the terms of a spendthrift trust by permitting an invasion of the corpus so as to increase the payments to the life beneficiary and to provide for current payments to the remaindermen. In discussing the power of the court in passing on a request for permission to deviate, this court stated (p. 12) : ''It is well settled that, in the exercise of this power of permitting what the court believes that the settlor would have permitted had he anticipated the emergency that has arisen, the court may permit a deviation from the express terms of the trust. . . . But this power to modify a trust is a limited one. It is to be exercised sparingly and only in the clearest of cases.''

Another interesting California case is *Security-First Nat. Bank* v. *Easter*, 136 Cal.App. 691 [29 P.2d 422]. There a trust consisted, in part, of a group of houses called Catalina Court. The decedent-settlor's wife was given the use for life of one of the houses rent free together with the sum of $300 per month out of the net income from the corpus. The balance of income was to go to the heirs at law of the deceased, who were also the remaindermen. The trustee was prohibited from selling or in any other manner disposing of Catalina Court. Because of the depression the value and income from the real property was so reduced that the trustee was unable to make the payments in full to the beneficiaries. The trustee brought an action to secure permission to sell the property. This was resisted by the remaindermen. The trial court made findings that the purposes of the trust would be frustrated without such sale and directed a sale for the best price obtainable. This was reversed, emphasis being placed on the absence of any showing that a reasonable price or any sum whatever could be obtained for the real property, and on the fact that there was no evidence to support a finding that, if a sale were permitted and the proceeds reinvested, there would be sufficient income to carry out the purposes of the trust. While the factual situation is different from the one

here presented, the case was dealing with an attempted modification claimed to be justified by changed economic conditions. In that case the income of the trust had decreased over 40 per cent because of the depression. The court had the following comments to make (p. 697) : ''In view of the seriousness of interfering with the express declarations of an express trust prohibiting the alienation of property for a limited time, a court of equity should not order the property to be sold except upon clear and satisfactory proof that it is necessary to do so to preserve the estate and carry out the intention and purpose of the testator. A court has no right to speculate upon the mere probability that such a sale will ultimately inure to the benefit of the beneficiaries. In the present unsettled financial condition of affairs it is generally conceded that all investments are highly speculative. Real estate may now ordinarily be sold only at a ruinous sacrifice. It is a perplexing problem to determine what investments may be fairly safe or reasonably profitable.''

In *Moxley* v. *Title Ins. & Trust Co.,* 27 Cal.2d 457 [165 P.2d 15, 163 A.L.R. 838], the majority of the Supreme Court were satisfied that a complaint requesting permission to deviate was demurrable because the plaintiff ''does not allege facts showing anything in the nature of an emergency or any peculiar circumstances which were not reasonably within the contemplation of the testatrix'' when she created the trust. (P. 468.) (See also *Estate of Van Deusen,* 30 Cal.2d 285 [182 P.2d 565] ; *Whittingham* v. *California Trust Co.,* 214 Cal. 128 [4 P.2d 142] ; *Estate of Keet,* 15 Cal.2d 328 [100 P.2d 1045].)

Cases from other states are, perhaps, more closely in point. Appellant refers us to six out-of-state cases where modification on the basis of claimed economic changes were denied. Three of these are from New Jersey. In *First Nat. Bank of Jersey City* v. *Stevens,* 9 N.J.Super. 324 [74 A.2d 368], the trust instrument was silent as to the nature of investments permitted the trustees. The plaintiff sought court permission to invest in securities other than those a fiduciary was authorized by statute to buy without a court order. The court held that the desire to invest in common stock to increase income and to hedge against inflation was not a sufficient showing of necessity or of emergency to warrant the deviation.

In *Reiner* v. *Fidelity Union Trust Co.,* 127 N.J.Eq. 377 [13 A.2d 291], a trust created in 1922 required reinvestment only in such securities as were permitted by the statute as legal investments for trust funds. The plaintiff sought authoriza-

tion to invest in nonlegals because of changed economic conditions. There had been no substantial shrinkage of the trust corpus and the shrinkage of income was "slight." At page 292 [13 A.2d] the following significant comment appears: "It appears that the sole purpose to be accomplished is to increase income by investing in stocks that will produce more but will not be legals.

". . . In this case the whole situation was put upon the basis of economics, not the necessity of the beneficiaries. The only witnesses were the trust officer of the trust company and an investment broker."

In *Bliss* v. *Bliss*, 126 N.J.Eq. 308 [8 A.2d 705], the trust instrument also limited investment to legals and permission was sought to invest in nonlegals on the ground of lowered income and loss of corpus caused by inflation. At page 706 [8 A.2d] the court stated: "It is not the province of this court to allow trustees to speculate in stocks which might result in a loss to the remaindermen. . . . It does not seem to me that the objects and purposes of the trust will be defeated by a continuance of the scheme set forth in testator's will."

Of course, if these three cases were to now arise in California, they would necessarily be decided differently because of the authority conferred on trustees by section 2261 of the Civil Code. But the theory of these New Jersey cases is relevant to our discussion.

In *Rogers* v. *English*, 130 Conn. 332 [33 A.2d 540, 147 A.L.R. 812], deviation was denied in spite of changed economic conditions, the court emphasizing that the trust was prospering in spite of the inflexible investment provisions. The Minnesota court in *In re Jones' Will*, 221 Minn. 524 [22 N.W.2d 633], refused a deviation aimed at increasing income, while the Maine court in *Porter* v. *Porter*, 138 Me. 1 [20 A.2d 465], refused deviation in a similar case where all interested parties requested it. The Maine court emphasized that there was no evidence of an emergency or that the beneficiaries were adversely affected.

Mention should also be made of a recent (1956) decision of the Missouri court—*Thomson* v. *Union Nat. Bank in Kansas City*, —— Mo. —— [291 S.W.2d 178]. There a trust had been created in 1913. For many years the trust earned income of between $4,800-$3,600 annually. That income had diminished to less than $1,400 annually. The trust instrument limited reinvestment to bonds. The life beneficiary and remaindermen sought permission to deviate by investing in

stocks. The court held that the power to permit deviations was limited to cases where not to deviate would seriously impair the basic trust purpose and then stated, using language quite appropriate to the instant case (p. 183) : "For the first twenty-five years or more the specified investments have accomplished all the testator's primary purposes even in the face of inflation and changing notions as to the safety and desirability of other types of investments. The testator's primary purposes have not been defeated or so substantially impaired by changed economic conditions . . . that the trustee should no longer be required to strictly conform to the directions of the trust and the settlor's explicit desires."

The cases cited by respondent involved real emergencies. Thus, in *Lambertville Nat. Bank* v. *Bumster,* 141 N.J.Eq. 396 [57 A.2d 525], a New Jersey case, the settlor, who died in 1945, prohibited the trustees from selling any of the securities in the trust estate. Seventy-seven per cent of these securities were highly speculative. The market value of the estate by 1948 had already declined 19 per cent. The chancellor held that, had the settlor envisaged the changed circumstances, he would have permitted the deviation. All the parties interested requested the deviation, including the trustee.

In *Citizens' Nat. Bank* v. *Morgan,* 94 N.H. 284 [51 A.2d 841], the income of the trust had been halved since the creation of the trust. The court granted relief from the restrictive investment provisions of the trust.

These cases involved real, not imagined emergencies. It is not the function of courts to remake the provisions of trust instruments. Generally, it is the duty of courts to enforce the provisions of the trust instrument. A court should not presume to remake a trust instrument even though the court believes that it could to a better job. The court's power to permit a deviation exists so that the settlor's main trust purpose will not fail, and to take care of grave emergencies. That is not this case. The trial court should not have permitted the deviation.

Respondent also argues that section 2261, subdivision (5), of the Civil Code supports the action of the trial court. That subdivision reads as follows: "The provisions of this section shall apply to all trusts now existing or hereafter created. Where, in trusts now existing or hereafter created, the term 'investments permissible by law for investment of trust funds,' or 'authorized by law for investment of trust funds,' 'legal investments,' or 'authorized investments,' or

other words of similar import are used in defining the powers of the trustee relative to investments, such language, in the absence of other controlling or modifying provisions of the trust instrument, shall be construed as authorizing any investment permitted by the terms of subdivision (1) of this section [establishing the Prudent Man Rule of investment].''

Respondent argues that the provision of the trust restricting the trustees to reinvesting in bonds is no different than if the testator had limited the trustees to such investments as were then permitted by law for the investment of trust funds. In that event, of course, the rules established by section 2261 would apply.

The obvious answer to this contention is that the settlor did not state that the trustees were to be limited by what the law provided were legal investments for trustees. He specified certain types of securities regardless of what the statute then provided and without reference to the statute. The quoted provision of the statute is only applicable where the testator limits investments to statutory approved investments. It has no application where the settlor himself specifies particular investments that are prohibited.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied June 7, 1957, and respondents' petition for a hearing by the Supreme Court was denied July 8, 1957. McComb, J., was of the opinion that the petition should be granted.